F. E. PATRICK v. THE RICHMOND & DANVILLE RAILROAD COMPANY.

*Pleading— Variance—Evidence—Agent.*

1. A plaintiff is entitled to such relief as the facts stated in his complaint, will admit, although he misconceives the manner in which it may be afforded.

2. A variance is not material unless it has misled the adverse party.

3. Where a contract with a railroad company provided that it might be terminated by a written notice for thirty days to be signed by a person designated in the contract; *It was held*, that the agent giving the notice had the power to recall it before the expiration of the thirty days.

4. *It seems*, that an agent to give notice of the intention of one party to a contract to end it, cannot withdraw the notice so as to continue the contract, after it has ceased to be operative.

5. In an action for damages for a breach of a contract, which could have been terminated by a notice, and a notice was given, but withdrawn before the contract was annulled; *Held*, that it is proper to allege in the complaint that no notice was given.

(*Jones* v. *Mial*, 82 N. C., 252, cited and approved).

CIVIL ACTION, tried before *Philips, Judge*, and a jury at Spring Term, 1885, of MECKLENBURG Superior Court.

The facts fully appear in the opinion.

The plaintiff, in submission to the rulings of his Honor, took a non-suit and appealed.

*Messrs. Jones & Johnston* and *A. M. Lewis & Son*, for the plaintiff.

*Messrs D. Schenck* and *Burwell & Walker*, for the defendant.

SMITH, C. J.   The plaintiff and the president of the defendant company, acting upon its behalf, entered into the following contract:

"This agreement, made the first day of August, 1876, between the Richmond & Danville Railroad Company of the first part, and F. E. Patrick of the second part, witnesseth: That whereas the said F. E. Patrick is now operating and proposes to operate, a cotton compress in the town of Charlotte, N. C., at present located on the cotton platform of said company in said town, and for the sake of convenience of access to the railroad of the party of the first part, and in consideration of the increased facilities which he will thereby acquire for the conduct of said compress, wishes to secure the right to occupy an additional portion of the cotton platform belonging to said company and contiguous to their depot in said town.

" Now, therefore, in consideration of the advantages that are likely to accrue to said company from the business and operations in which the said Patrick shall embark, and of the sum of one dollar to them paid, the receipt whereof is hereby acknowledged, the said Richmond and Danville Railroad Company hereby agree to rent to the said Patrick for the term of three years from the first day of August, 1876, (subject to revocation, as hereinafter provided), so much of their said platform as is embraced in the space marked red on the plat accompanying and forming part of this agreement, granting to said Patrick the right to erect at

his own cost, suitable sheds over said portion of platform so rented as aforesaid, provided, however, the operations of said company are not thereby interfered with. And it is further agreed, that at the expiration of said term, the said Patrick shall have the privilege of renewing the same for an additional term of two years, on the same terms and conditions. It is understood that the location of the compress, and of the boiler operating the same, are to be the same as at present, and as indicated in the accompanying plat—the party of the second part expressly binding himself that the same shall not be changed except by the consent and under the direction of the party of the first part, and that the smokestack thereto shall at all times be provided with an efficient spark arrester, and the property of the party of the first part shall be in no wise endangered by fire on account of the operations of the party of the second part.

"It is distinctly understood and agreed that the said Richmond and Danville Railroad Company, reserves the right to reclaim possession of said platform, and to recall and end all rights and privileges herein granted, at any time during the continuance of said term, whenever, in the judgment of the President or General Superintendent of said company, the interest of said company so require, after first giving thirty (30) days' notice in writing to said Patrick or his assigns, or to any party in the use and occupancy of said platform, of their (the said company's) intention to reclaim such possession, and the said Patrick hereby agrees to deliver possession of said platform to said railroad company on demand and notice as aforesaid.

"And it is further agreed by the parties hereto, that in the event of said railroad company reclaiming at any time, possession of said platform, the said Patrick, his successors or assigns, shall remove, without cost, injury or loss to said company, within the period of sixty (60) days from notice of intention to so reclaim, the said compress and all sheds which may have been erected thereon.

" Witness the following signatures this day and year herein first above written.

"THE RICHMOND & DANVILLE RAILROAD COMPANY,
"By A. S. BUFORD, Pres.
"F. E. PATRICK."

The complaint alleges that the plaintiff has observed all the conditions and specifications contained in the lease and devolving upon him, and continued his compress operations until the 23d day of December, 1877, when they were put. a stop to by the entry of the officers and servants of the company, in the night time and during his absence, upon the premises, and their taking possession of the plaintiff's compress and other property used with it, without giving the notice required under the contract; and of their action he was soon after notified, as well as of the intention of the company to resist with force any attempt on his part to re-enter.

For this alleged wrongful dispossession and withholding of the plaintiff's property, and for the losses consequent from the breaking up of the plaintiff's business, he seeks redress in the present action, and demands large damages.

The defendant in its answer, denies the imputed wrongful act; avers that due and sufficient notice was given of the intended termination of the lease and the withdrawal of the rights and privileges attaching to it, and that notwithstanding and after the thirty days provided in the contract had expired, the plaintiff did not desist, but continued to carry on his compress operations as before, for sixty days more after the service of the notice; and that thereupon the defendant entered upon the premises, as it might lawfully do, and resumed possession of its platform whereon the compress was, notifying the plaintiff that he was at liberty to enter for the purpose of removing what property belonged to him.

The notice referred to and produced on the trial, bearing date October 20th, 1877, and which the plaintiff received two days

later, is in the form of a note addressed to him by T. M. R. Talcott, acting in his official capacity, as general superintendent, and in which he is notified that, at the end of thirty days, the company "will resume the control and occupancy of our platform at Charlotte, now used by you in connection with your compress;" and further directing him in these words: "You will be allowed thirty days additional in which to remove your machinery, boilers, &c., from the company's platform; but we will not permit the use of the compress, after the expiration of the thirty days from date."

A notice was also issued to the plaintiff on December 23d, 1877, over the signature of A. B. Andrews, an agent of the company, (and a second in the same terms followed on Monday, the next day, to remove any objection to the first on account of its being Sunday), informing the plaintiff, that "in accordance with instructions from Col. Talcott, general superintendent of the R. & D. Railroad Company, and per agreement between the Railroad Company and yourself, I have this day taken possession of the platform at the depot, on which your compress is located. And I hereby forbid you, your agents or employees from entering upon the premises for any purpose."

We forbear upon entering upon an inquiry as to the correctness of the several rulings by which evidence offered by the plaintiff was excluded, as not pertinent to the allegations contained in the complaint and the relief demanded, and proceed to the consideration of a single exception, decisive of the case on appeal, with the remark that these rulings seemed to be a very strict enforcement of the former, and superadded principles of pleading, which now govern, and to ignore the adjudications made in *Jones* v. *Mial*, 82 N. C., 252, and subsequent supporting cases, which declare a plaintiff entitled to such relief as the facts stated in his complaint will admit, while he may misconceive the way in which it is to be afforded. The rulings seem also to be at variance with the Code of Civil Procedure, which enacts "that no variance between the allegation in the pleading and

the proof, *shall be deemed material, unless it has actually misled the adverse party* to his prejudice in maintaining his action upon the merits." The Code, §§269 and 270.

We propose to examine only the last in the series of exceptions to the action of the Court, in refusing to hear testimony, in consequence of which the plaintiff declined to proceed in the case, and suffered a nonsuit and appealed.

To obviate the effect of the notice given to terminate the contract relations of the parties, the plaintiff proposed to show that in an interview between himself and the general superintendent who gave it, had on November 20th, before the notice became efficacious, the latter withdrew the notice with a view to the continuance of the subsisting relations formed by the contract. On objection, the evidence was held to be incompetent by the Court upon two grounds :

1st. Because the plaintiff had not shown a *prima facie* case of agency in Talcott to re-call the notice and re-instate the lease, and

2nd. For that there was a material variance between the allegation and offered proof.

In our opinion, the evidence ought to have been received, and neither of the assigned reasons is sufficient to warrant its exclusion.

The contract itself designates the officers of the company ; its president, who on its behalf entered into it, and its general superintendent, to each of whom is committed the right to determine whether it should continue, or be abrogated in the interest of his principal. This is an express delegation of authority to the superintendent to put an end to the relations formed under it, and as he may exercise it at his discretion, so he may refrain from exercising it at all, or forbear to proceed after taking initiatory steps in the matter at any time, at least with the assent of the other party, before any practical result has been reached, or their relative rights have been changed. This proposition so forcibly commends itself to the approval of the judicial mind, as to need

no argument or authority for its support. Such is the present case. The thirty days' notice of the intended action of the company had not passed, and the future termination of the lease, as yet, only rested in a purpose formed but not carried into effect. The former relations of the contracting parties were unaffected by what had been done, and so might continue, unless and until the reserved power to terminate was exercised, and by its exercise the lease was ended.

We are unable to see any reason whatever, why the superintendent should be held to be incompetent to pause and not act under the notice, or in other words to withdraw it, because if not recalled it might in time have had the effect of ending the contract. Can it be that a purpose to annul, conveyed though it may be in writing, yet superinduced by false information, afterwards ascertained to be such, cannot be abandoned when it is for the interest of the principal that it should be, and so the superintendent believes? Is the first erroneous step in the direction of the exercise of the reserved power, so potent as to compel him to persevere against his own judgment? Is a mere written notification of a future intended act, *vox emissa non revocabalis*, requiring that the act shall be done? Is there no intermediate *locus penitentiæ*, where progress may be arrested? The power to stop is inseparable from the power to proceed, and rests, in our opinion, equally in the agent who undertakes to use it. Until the purpose is made effectual, it is and must be under the control of the one in whose mind it is formed. It is not the case of action consummated by an annulment of existing relations, which perhaps the agent, whose authority was exhausted in doing so, may not then be able to restore and thus *renew*, that is, again enter into a similar or the same contract and bind his principal. To such a case some of the authorities cited in the full brief submitted by defendant's counsel are applicable. This is not an attempted renewal of an ended contract, but the recall of a notice in pursuance of which it might soon have been ended; but the preservation of a contract, entered into and recog-

nized as binding on the defendant and not destroyed when it might have been by its agent.

Assuming that the power remained in the superintendent to withdraw his notice, and let the lease remain, it is obvious the second reason given for the rejection of proof of the fact of withdrawal is equally unfounded.

A notice recalled ceases to have any further operation, and is the same as if none had been given. It was therefore logically and legally correct, to aver that no notice of an intended resumption of the possession of the leased premises, and the privileges secured to the plaintiff under the contract, had been given before the alleged wrongful acts of the defendant were committed, and the rejected evidence was in support of the averment. We are not called upon to inquire into the extent of the authority of a general superintendent of a railway to act for the company whose agent he is, *virtute officii,* but the very name indicates the possession of very large authority from the principal. The learning upon this subject has no bearing upon the present controversy, for he is, in the contract itself, invested with the power to terminate, and, as we have said, to refrain from terminating, the contract, even after he has given notice of the contemplated abrogation, but before abrogation has been accomplished, and in this he is associated with the president, the highest officer of the corporation, and shares with him the power to annul, when in his judgment the interests of their common principal may so require. We do not advert to the declarations of the president, made to the plaintiff just before the alleged withdrawal of the notice, as he testifies, " Well, I will see Talcott immediately, and write or wire you at once," as indicating the extent of the superintendent's authority in the premises, since, without this, it was clearly in his power, not to undo anything done, but to recall and put out of the way the notice, as a precedent requisite to effective action, and to let the lease and contract stand, as if none had been given. There is, therefore, error in ruling out the evidence

proposed, for which the plaintiff is entitled to have a new jury. Judgment reversed.

Let this be certified, to the end that a *venire de novo* be awarded.

Error.                                                    Reversed.